UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X   Case No.

ERIC STEINHAUSER,

           Plaintiff,

- against -                                       **COMPLAINT**

THE NATURE CONSERVANCY,

                                                                       **PLAINTIFF DEMANDS**
            Defendant.                                **A TRIAL BY JURY**

------------------------------------------------------------------------X

      Plaintiff Eric Steinhauser, by and through his attorneys, NISAR LAW GROUP, P.C., hereby complains of Defendant, upon information and belief, as follows:

## NATURE OF THE CASE

1. Plaintiff complains pursuant to <u>Title VII of the Civil Rights Act of 1964</u>, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (amended in 1972, 1978 and by the Civil Rights Act of 1991, Pub. L. No. 102-166) ("Title VII") and the <u>New York City Human Rights Law</u>, New York City Administrative Code § 8-107, *et seq.* ("NYCHRL") and seeks damages to redress the injuries Plaintiff has suffered as a result of being **<u>Discriminated against</u>** and **<u>Terminated</u>** by his employer due to his **<u>Gender (male).</u>**

2. Plaintiff contends that Defendant discriminated against him by terminating his employment on the basis of gender bias and false and defamatory statements by employees who were attempting exert retribution against him. Upon information and belief, one employee believed that Plaintiff's new directives and initiatives were upstaging and negatively contrasting her prior efforts in a similar managerial role over the past 12 years. Another employee was unhappy with Plaintiff's new directives and initiatives and generated false and defamatory statements against him in retaliation. And

another employee was upset that Plaintiff (who was a new employee) had approved a Performance Improvement Plan ("PIP") for her. Defendant's decisionmakers did not properly investigate these employees' false claims and failed to follow basic procedures for dealing with employee complaints. Instead, Defendant, already facing severe organization-wide pressure from a well-publicized gender discrimination investigation of its executive managers, accepted at face value the false assertions of these employees and terminated Plaintiff's employment based on him being male.

## JURISDICTION AND VENUE

3. Jurisdiction of this Court is proper under 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. §§ 1331 and 1343.

4. The Court has supplemental jurisdiction over Plaintiff's claim brought under city law pursuant to 28 U.S.C. § 1367.

5. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) as it is a judicial district in which a substantial part of the events or omissions giving rise to the claims occurred.

## PROCEDURAL PREREQUISITES

6. Plaintiff filed charges of discrimination upon which this Complaint is based with the Equal Employment Opportunities Commission ("EEOC").

7. Plaintiff received a Notice of Right to Sue from the EEOC, dated June 8, 2020, with respect to the herein charges of discrimination.

8. This Action is being commenced within ninety (90) days of receipt of said Notice.

## PARTIES

9. At all times relevant, Plaintiff Eric Steinhauser ("Plaintiff") was and is a resident of the State of New York and New York County.

10. At all times relevant, Defendant The Nature Conservancy ("Defendant" or "TNC") was and is a foreign not-for-profit corporation, duly existing pursuant to, and by virtue of, the laws of Washington, D.C.

11. At all times relevant, Defendant was and is a foreign not-for-profit corporation which lawfully conducts business in the State of New York and owned, operated, and/or maintained an office located at 322 Eighth Avenue, 15th Floor, New York, NY 10001 ("the office").

12. At all times relevant, Richard Loomis ("Mr. Loomis") was an employee of Defendant, holding the position of "Chief Marketing Officer."

13. At all times relevant, Mr. Loomis was Plaintiff's supervisor and/or held supervisory authority over Plaintiff.

14. At all times relevant, Felicia Green ("Ms. Green") was an employee of Defendant, holding the position of "Human Resources Business Partner."

15. At all times relevant, Allison Small ("Ms. Small") was an employee of Defendant, holding the position of "Global Director, Talent & HR Management."

**MATERIAL FACTS**

16. On or about January 3, 2019, after an extensive interview process, including no fewer than 15 interviews and a mandatory intensive creative campaign exercise, Plaintiff began working for Defendant as "Director of Global Marketing, Creative & Content," earning approximately $250,000.00 per year, and reporting directly to Mr. Loomis. At all times relevant, Plaintiff worked at the office.

17. As per Mr. Loomis, Plaintiff was hired to improve Defendant's creative content across the organization to better support the mission of Defendant's organization. The objective

was to evolve Defendant's Global Marketing, Creative and Content department from a creative services team to a creative ideation team that could engage with Defendant's partners earlier in the development process to create higher quality content to reflect its global conservation agenda.

18. On or about January 3, 2019, Defendant also issued a press release announcing Plaintiff's hiring and stated, "In this new role, [Plaintiff] will drive the creative vision, editorial, strategies, and storytelling of [Defendant's organization] across all platforms."

19. Throughout his tenure, Plaintiff was an overall good employee and routinely received compliments for his job performance. In fact, as Director of Global Marketing, Creative & Content, Plaintiff successfully:

- attended Defendant's Global Marketing Conference in New Orleans to share an introductory presentation of his work, his team, and his creative vision;
- instigated weekly meetings with team leads to discuss new ways to partner together and begin to share stories across all media platforms;
- met with team leads from other divisions of Defendant and cultivated proactive initiatives for the creative department;
- created and produced a new TNC Youth Engagement-Bezos Family Foundation-sponsored virtual field trip to the coral reefs of the Caribbean that was live-streamed to classrooms around the world reaching over 170,000 students in 61 countries and all 50 states;
- led the creation of a highly successful full-page ad for The New York Times Magazine's special climate issue, which received acclaim from the CEO and senior executives throughout the organization;
- helped partner with internal teams and direct the creative efforts of an outside ad agency for the development of the 2019 Global Earth Month campaign;
- developed a new series of video promos featuring staff writers on location to showcase feature stories for Nature Conservancy Magazine's Spring and Summer 2019 issues;
- worked with the Corporate Partnership and NA Marketing to create and sell a unique and exciting video content series with the founder of Dogfish Head brewery;
- traveled to Denver to meet with the Global Communications team to ideate creative platforms for a 2020 global conservation agenda;
- worked with NatureVest and NA Marketing team to create new video content to announce Defendant's new Cumberland Forest land acquisition;
- led the creation of a new interview series celebrating the diversity, vision and passion of the people of Defendant's organization;

4

- supervised the creative development of the 2019 Global Photo Contest campaign;
- worked with the Corporate Partnership team to develop a new creative platform for Defendant's Plant a Billion trees program;
- worked with Global Communications team on a new creative platform for Global 2020 Biodiversity campaign;
- worked with GMAC team on new creative platform for 2020 Earth Month campaign;
- traveled to Baton Rouge to present the new creative vision and direction to Defendant's regional Gulf team; and,
- supervised the development of a TNC pilot pod cast series.

20. However, at the same time, unbeknownst to Plaintiff, a few employees who were not eager to embrace his new directives were engaging in active efforts to derail his employment with TNC. In fact, Plaintiff did not learn of these actions until around May 7, 2019, when Senior Advisor Ron Geatz (a 30-year veteran of Defendant) informed Plaintiff that Defendant's *former* Creative Director (i.e., a person named Stella Cha) had been aggressively and negatively speaking about him to numerous members of his team as well as other senior managers throughout Defendant's organization. While Mr. Geatz did not know the reason for Ms. Cha's actions, he hypothesized that she may be feeling insecure in her new position at Defendant's organization, and by defaming Plaintiff, she could adversely impact his stature and create the opportunity for her to return to her former position. Mr. Geatz also stated that this was very much in her nature and shared instances of her maneuvering behind his back when he (Mr. Geatz) had been her direct supervisor.

21. Two days later, on or about May 9, 2019, Curtis Runyan (Defendant's Magazine Editor-in Chief) notified Plaintiff that Ms. Cha had been "trash talking" him to numerous members of his team and speaking negatively about the new work that he had been spearheading. Mr. Runyan advised Plaintiff that Ms. Cha was telling her former employees (who currently reported to Plaintiff) that these projects "were sh*t," "a waste

of time and money," and were not in Defendant's best interests. Mr. Runyan also advised Plaintiff that Toby Hayman (Director of Video) was in close contact with Ms. Cha, his former supervisor of six years, and was also openly sharing derogatory comments about the new initiatives. When Plaintiff told Mr. Runyan that his (Plaintiff's) weekly one-on-one meetings with Mr. Hayman were quite positive in nature and that Mr. Hayman appeared to be aligned with the new directives, Mr. Runyan reiterated emphatically "he is <u>not</u> on board."

22. As such, also on or about May 9, 2019, Plaintiff confided in Alan Feldenkris (Director of North American Marketing) regarding Ms. Cha, who told him that Ms. Cha had a history of this sort of vindictive back-channel behavior and that she was "poison," and recommended that Plaintiff ask Mr. Loomis to report it to Ms. Green in Human Resources.

23. The next day, on or about May 10, 2019, Plaintiff notified Mr. Loomis of Ms. Cha's divisive actions and attempts to sabotage his relationships with his subordinates. In response, Mr. Loomis agreed to share Plaintiff's complaint with Ms. Green and with Ms. Cha's direct supervisor, Guilio Boccoletti.

24. On or about May 23, 2019, a subordinate of Plaintiff, Monica Chan (Associate Director of Creative Management), requested permission from Plaintiff and Ms. Green to place Kristine Brennan (Global Content and Advertising Manager) on a 60-day PIP due to chronically poor performance over the course of her tenure. Plaintiff approved it, and on or about May 23, 2019, Kristine Brennan was put on a 60-day PIP, upon which her performance would then be evaluated. Upon information and belief, Ms. Brennan then complained to Human Resources and falsely accused Plaintiff of gender discrimination in

retaliation for approving her PIP. The reason Ms. Brennan *specifically* chose to make a false complaint of gender discrimination was calculated, as will be discussed below.

25. On or about May 23, 2019, Mr. Loomis confirmed that he had relayed Plaintiff's concerns about Ms. Cha to Ms. Green and Ms. Cha's supervisor, Guilio Boccoletti, and suggested that Plaintiff reach out to Ms. Green to follow up.

26. Accordingly, on or about May 23, 2019 and again on or about May 28, 2019, Plaintiff emailed Ms. Green concerning Ms. Cha's campaign against him. However, Ms. Green failed to respond to Plaintiff until May 30, 2019, at which point she stated that she wanted to check with Mr. Loomis before speaking with him.

27. While this was all going on, Defendant was also attempting to manage a growing crisis with respect to allegations of sexual harassment and gender discrimination within TNC's organization. More specifically, a series of tweets were posted to #nonprofitmetoo alleging that an executive of Defendant had sexually harassed and discriminated against women and that others in Defendant's management had ignored this behavior. Reports began appearing in the press and at least one substantial funder—to wit, Dogfish Head Brewery—withdrew from a partnership project.

28. Also, by way of background, on or about March 25, 2019, Defendant retained McDermott Will & Emery ("MWE") to conduct an independent third-party investigation into the allegations, resulting in a report which found that, "numerous employees who contacted [MWE's] investigator reported that [Defendant] is a male-dominated culture where it is difficult for women to flourish."

29. Notably, MWE's report also stated:

> [T]he manner in which [Defendant] approaches investigating [claims of gender discrimination] needs to be updated to reflect changes in best

      practices in the post #MeToo era.  Specifically, in several instances where there were serious allegations of misconduct, [Defendant] opted for no or minor discipline because [Defendant] perceived the event as 'he said/she said' with no corroborating evidence.  In these instances, the accused was given the benefit of the doubt.  While it's important to ensure due process for those accused of misconduct, there is no criminal burden of proof applicable to employment disputes.  Going forward, those who investigate will need to make credibility determinations even when there is no corroborating evidence.  Central to this determination, and what was missing in many of these investigations, is real evaluation of why/whether the person coming forward has an incentive to lie.

30. Upon information and belief, each of the aforementioned findings caused the pendulum to swing in the other direction.  In fact, MWE's report motivated Defendant's decision-makers to start taking a hard line against male employees, even before the facts were clearly developed with respect to gender discrimination claims, as a way to improve Defendant's perceived stance on discrimination against women.  TNC was concerned about the negative impact these findings, now made public, would have on its reputation and fundraising capabilities and committed to showing that it took the plight of women seriously, even at the cost of rushing to judgment and firing men accused of discrimination before the facts of the underlying complaints could be properly vetted.

31. Two days later, on or about May 31, 2019, Brian McPeek (President) was forced to resign from his position.  On or about June 10, 2019, due to further complaints of failure to address gender discrimination, TNC terminated the employment of Luis Solórzano (Caribbean Executive Director). On or about June 11, 2019, in  another attempt to counter the narrative of a workplace filled with discrimination against women, Defendant announced that it named Sally Jewell (female) as the Interim CEO, effective September 3, 2019, and named Francis Ulmer (female) as the next Chair of the Board, effective November 1, 2019.  On or about June 13, 2019, Mark Tercek (CEO) was the next person

forced to resign from his position due to the pressure and current climate at Defendant's organization.

32. Then, only seven days after that (i.e., on or about June 20, 2019), Plaintiff attended a scheduled meeting with Mr. Loomis for the purpose of discussing team projects and to review the Creative Department's new working process proposal. Instead, when Plaintiff arrived at the meeting, he was surprised to find that Ms. Small was also present. Without any hesitation, Mr. Loomis suddenly terminated Plaintiff's employment due to a purported "lack of clarity in [Plaintiff's] administrative process."

33. When Plaintiff pushed back on this suspicious reason, Ms. Small then told Plaintiff that his employment was actually being terminated due to purported "complaints made against [him] to Ethics and Compliance." Without providing any specifics, Ms. Small stated in broad terms that the complaints consisted of allegations that Plaintiff had "proliferated a bro culture," had engaged in "gender bias," was "physically intimidating" towards employees, and had "created a hostile work environment."

34. In a state of shock, Plaintiff emphatically denied the allegations and immediately requested an opportunity to read the complaints to which Ms. Small was referring or at least learn of the specifics behind the allegations. However, Ms. Small refused to explain who had complained or provide any further detail as to the substance of the complaints. All she repeated was that Plaintiff "proliferated a bro culture," had "gender bias," was "physically intimidating," and "created a hostile work environment."

35. When Plaintiff asked why he wasn't given the opportunity to dispute any of the allegations, Ms. Small stated that her decision was "final" and that she was not prepared to receive any information from Plaintiff to rebut the allegations.

36. Plaintiff pressed to know why Ms. Green had never responded to his complaints about Ms. Cha, to which Ms. Small responded, "because I told her not to."

37. After Ms. Small left the meeting, Mr. Loomis admitted, "I might be making the wrong decision in dismissing you but I do not think you are going to be able to succeed here in the current climate," clearly referring to the sexual harassment/ gender discrimination report and the events which occurred in its wake. Again, Plaintiff offered to give complete cooperation to show the falsity of every allegation of gender-based discrimination, but Defendant refused to accept anything from him.

38. Plaintiff left as instructed.

39. The basis for the discrimination claims in this action is, upon information and belief, after learning that Plaintiff had approved her PIP, Kristine Brennan started falsely accusing Plaintiff of gender discrimination, knowing that it would be the easiest way to get him fired given the landscape and seeming purge of sexual harassment offenders which was being undertaken by Defendant. In addition, upon information and belief, aware of the current scandal and still unhappy with the new directives and initiatives Plaintiff had implemented, Mr. Hayman also falsely alleged that Plaintiff was engaging in gender-based discrimination, knowing that it would be the easiest way to get him fired given all that was going on in the organization.

40. Defendant's reason for termination was undoubtedly pretextual, as Defendant was aware (or at least could have easily become aware) that the allegations against Plaintiff were false and clearly followed an irregular investigative and adjudicative process as it related to complaints made against Plaintiff because he was male (as opposed to female). First, Defendant refused to share these complaints with Plaintiff or even make him aware of

their existence. Second, Defendant refused to interview relevant witnesses whom Plaintiff brought to Defendant's attention. Upon information and belief, Defendant did not even interview knowledgeable third parties about the complaints about Plaintiff's behavior toward the women on his team. Third, Mr. Loomis, Ms. Green, and Ms. Small were all aware of Ms. Cha's attempts to manipulate her former (and Plaintiff's current) subordinates and coworkers. Third, Defendant was aware that Kristine Brennan had a well-documented history of erratic behavior with coworkers and was currently on a PIP authorized by Plaintiff at the time she made the complaint.

41. Following Plaintiff's termination, several members of his former team—including female employees—reached out to him. These former subordinates expressed shock and sadness to hear the news and agreed that they had never witnessed him behaving in a manner that they construed as "creating a hostile work environment" or "proliferating a bro culture." One employee stated that in her 17 years working for Defendant, she had witnessed a strong indifference to gender issues, but was saddened that those issues were now "being used to discriminate in a reverse gender manner."

42. Defendant summarily terminated Plaintiff's employment without an investigation, interview, or any semblance of due process, based upon vague allegations that multiple witnesses including Plaintiff were prepared to aggressively dispute. Defendant acted to ambush Plaintiff while depriving him of an opportunity to defend himself.

43. At the same time, Defendant admittedly refused to even investigate complaints brought by Plaintiff (a male employee) alleging misconduct by a female employee.

44. Taking into account the suspicious reasons for termination as well as the extremely close temporal proximity between the abrupt ousting of Defendant's executives in a very public

sexual harassment scandal and Plaintiff's termination, it is clear that Defendant terminated Plaintiff's employment as a result of that scandal, and more specifically, as a result of his gender. While Defendant is to be lauded for proactively addressing gender bias issues (which had seemingly been percolating for some time), this does not give it license—even in an attempt to be sensitive to the "current climate"—to treat Plaintiff differently from female employees.

45. Mr. Loomis had even told Plaintiff on numerous occasions, "We, as men, now need to be extremely careful. You have no idea how bad it is."

46. In view of the complete lack of merit in the allegations and the absence of a proper investigation, it is clear that Defendant terminated Plaintiff's employment as a result of bias based on his gender.

47. Plaintiff was treated differently by Defendant due to his gender (male).

48. But for the fact that Plaintiff is male, Defendant would not have never terminated his employment.

49. Plaintiff's performance was, upon information and belief, good during the course of his employment with Defendant.

50. Plaintiff has been unlawfully discriminated against, humiliated, and degraded, and as a result, suffers loss of rights, emotional distress, loss of income and earnings.

51. Defendant's actions and conduct were intentional and intended to harm Plaintiff.

52. As a result of Defendant's actions, Plaintiff feels extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

53. As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of income, the loss of a salary, bonuses, benefits and other

compensation which such employment entails, and Plaintiff has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

54. Defendant's conduct was malicious, willful, outrageous, and conducted with full knowledge of the law. As such, Plaintiff demands Punitive Damages as against all Defendant, jointly and severally.

## AS A FIRST CAUSE OF ACTION
## FOR DISCRIMINATION UNDER TITLE VII

55. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

56. This claim is authorized and instituted pursuant to the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section(s) 2000e, *et seq.*, for relief based upon the unlawful employment practices of Defendant. Plaintiff complains of Defendant's violation of Title VII's prohibition against discrimination in employment based, in whole or in part, upon an employee's gender.

57. Defendant engaged in unlawful employment practices prohibited by 42 U.S.C. § 2000e, *et seq.*, by discriminating against Plaintiff because of his gender.

## AS A SECOND CAUSE OF ACTION FOR DISCRIMINATION
## UNDER THE NEW YORK CITY ADMINISTRATIVE CODE

58. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

59. The New York City Administrative Code § 8-107(1) provides that "It shall be an unlawful discriminatory practice: (a) For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender,

  disability, marital status, sexual orientation or alienage or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment."

60. Defendant engaged in an unlawful discriminatory practice in violation of New York City Administrative Code § 8-107(1)(a) by discriminating against Plaintiff because of his gender.

## JURY DEMAND

61. Plaintiff requests a jury trial on all issues to be tried.

**WHEREFORE**, Plaintiff respectfully requests a judgment against Defendant:

A. Declaring that Defendant engaged in unlawful employment practices prohibited by Title VII and the NYCHRL, in that Defendant discriminated against Plaintiff and terminated his employment solely on the basis of his gender;

B. Awarding damages to Plaintiff for all lost wages and benefits resulting from Defendant's unlawful discrimination and to otherwise make him whole for any losses suffered as a result of such unlawful employment practices;

C. Awarding Plaintiff compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injury to his reputation in an amount to be proven;

D. Awarding Plaintiff punitive damages;

E. Awarding Plaintiff attorneys' fees, costs, disbursements, and expenses incurred in the prosecution of the action; and

F. Awarding Plaintiff such other and further relief as the Court may deem equitable, just and proper to remedy the Defendant's unlawful employment practices.

Dated: New York, New York
       September 4, 2020

**NISAR LAW GROUP, P.C.**

By: _____
Casey Wolnowski, Esq.
*Attorneys for Plaintiff*
570 Lexington Ave., 16th Floor
New York, New York 10022
Ph: (646) 449-7210
Email: cwolnowski@nisarlaw.com

15